UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONIQUE GRIMES, as Personal
Representative of the Estate of            No. 2:17-cv-12860
Damon Grimes, deceased

     Plaintiff,                           *consolidated with*

v                                          Case No. 17-cv-13580

                                          HON. GERSHWIN A. DRAIN

TROOPER MARK BESSNER,
TROOPER ETHAN BERGER, and                  MAG. ELIZABETH A. STAFFORD
SGT. JACOB LISS,

     Defendants.

---

Geoffrey N. Fieger (P30441)            John G. Fedynsky (P65232)
James J. Harrington IV (P65351)        Mark E. Donnelly (P39281)
Danielle L. Dezbor (P79488)            Joseph T. Froehlich (P71887)
Stephanie L. Arndt (P66870)            Assistant Attorneys General
Fieger, Fieger, Kenney & Harrington,   Attorneys for Defs. Berger and Liss
P.C.                                   Michigan Dep't of Attorney General
Attorneys for Plaintiff                State Operations Division
19390 W. 10 Mile Road                  P.O. Box 30754
Southfield, MI 48075                   Lansing, MI 48909
(248) 355-5555                         (517) 335-7573
g.fieger@fiegerlaw.com                 fedynskyj@michigan.gov
j.harrington@fiegerlaw.com             donnellym@michigan.gov
d.dezbor@fiegerlaw.com                 froehlichj1@michigan.gov
s.arndt@fiegerlaw.com

---

## DEFENDANTS BERGER AND LISS'S MOTION
## FOR SUMMARY JUDGMENT

    Defendants Ethan Berger and Jacob Liss, by counsel, submit this motion for

summary judgment.  Concurrence in the relief requested was sought.  The movant

explained the nature of the motion and its legal basis, but concurrence was not

forthcoming.  E.D. Mich. LR 7.1(a).  For the reasons stated in the accompanying

brief, Defendants request that this Court (1) grant qualified immunity, (2) grant

governmental immunity, (3) dismiss all claims against Defendants, and (4) grant

any other appropriate relief.

> Respectfully submitted,
>
> Dana Nessel
> Attorney General
>
>
> */s/ John G. Fedynsky*
> John G. Fedynsky (P65232)
> Mark E. Donnelly (P39281)
> Joseph T. Froehlich (P71887)
> Assistant Attorneys General
> Attorneys for Defs. Berger and Liss
> Michigan Dep't of Attorney General
> State Operations Division
> P.O. Box 30754
> Lansing, MI 48909
> (517) 335-7573

Dated:  November 7, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONIQUE GRIMES, as Personal
Representative of the Estate of                    No. 2:17-cv-12860
Damon Grimes, deceased

        Plaintiff,                                 *consolidated with*

v                                                  Case No. 17-cv-13580

                                               HON. GERSHWIN A. DRAIN

TROOPER MARK BESSNER,
TROOPER ETHAN BERGER, and                          MAG. ELIZABETH A. STAFFORD
SGT. JACOB LISS,

        Defendants.

---

| | |
|---|---|
| Geoffrey N. Fieger (P30441) | John G. Fedynsky (P65232) |
| James J. Harrington IV (P65351) | Mark E. Donnelly (P39281) |
| Danielle L. Dezbor (P79488) | Joseph T. Froehlich (P71887) |
| Stephanie L. Arndt (P66870) | Assistant Attorneys General |
| Fieger, Fieger, Kenney & Harrington, P.C. | Attorneys for Defs. Berger and Liss |
| Attorneys for Plaintiff | Michigan Dep't of Attorney General |
| 19390 W. 10 Mile Road | State Operations Division |
| Southfield, MI 48075 | P.O. Box 30754 |
| (248) 355-5555 | Lansing, MI 48909 |
| g.fieger@fiegerlaw.com | (517) 335-7573 |
| j.harrington@fiegerlaw.com | fedynskyj@michigan.gov |
| d.dezbor@fiegerlaw.com | donnellym@michigan.gov |
| s.arndt@fiegerlaw.com | froehlichj1@michigan.gov |

---

**DEFENDANTS BERGER AND LISS'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Dana Nessel
Attorney General


John G. Fedynsky (P65232)
Mark E. Donnelly (P39281)
Joseph T. Froehlich (P71887)
Assistant Attorneys General
Attorneys for Defs. Berger and Liss
Michigan Dep't of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
fedynskyj@michigan.gov
donnellym@michigan.gov
froehlichj1@michigan.gov

Dated:  November 7, 2019

# TABLE OF CONTENTS

Page

Table of Contents ................................................................................. i

Index of Authorities ........................................................................... iii

Concise Statement of Issues Presented ............................................. vii

Controlling or Most Appropriate Authority ..................................... viii

Introduction .........................................................................................1

Statement of Facts ............................................................................. 2

    The initiation of the vehicle pursuit................................................2

    Objective video evidence. ...............................................................3

    Berger's description of the pursuit. .................................................5

    Jacob Liss's limited involvement with the investigation................7

    MSP conducted a thorough investigation, found no attempt to cover up
    the taser use...................................................................................8

    Bessner is criminally charged, convicted, and sentenced. ..............9

    The claims of the estate. ...............................................................10

Argument.............................................................................................10

I.    Berger and Liss receive the protections of qualified immunity because
    they did not violate any clearly established rights. ..........................10

    A.    Qualified immunity is a threshold legal defense that is broad in
        its application and scope. ...................................................10

    B.    There is no viable excessive force claim against Berger. ..................13

    C.    There was no conspiracy to deny any civil rights...............17

II.     The state law claims fail as a matter of law under governmental
        immunity doctrine. ...........................................................................19

        A.      Governmental immunity under Michigan law also provides a
                threshold legal defense that is broad in its application and
                scope. ...................................................................................19

        B.      There is no viable assault and battery claim against Berger. ..............22

        C.      Gross negligence is not a recognized standalone claim and in
                any event cannot be shown here. ..........................................................23

Conclusion and Relief Requested ...........................................................................25

Certificate of Service ...............................................................................................26

# INDEX OF AUTHORITIES

Page

**Cases**

*Anderson v. Creighton*,
 483 U.S. 635 (1987)................................................................................12

*Bartell v. Lohiser*,
 215 F.3d 550 (6th Cir. 2000).................................................................18

*Baynes v. Cleland*,
 799 F.3d 600 (6th Cir. 2015).................................................................13

*Betzak Land Co. v. City of Detroit*,
 298 F.3d 559 (6th Cir. 2002).................................................................17

*Bletz v. Gribble*,
 641 F.3d 743 (6th Cir. 2011).................................................................22

*Brewer v Perrin*,
 132 Mich App 520 (1984).....................................................................24

*Burley v. Gagacki*,
 834 F.3d 606 (6th Cir. 2016).................................................................13

*Burnett v. City of Adrian*,
 414 Mich. 448 (1982)............................................................................21

*Center for Bio–Ethical Reform, Inc. v. Napolitano*,
 648 F.3d 365 (6th Cir. 2011).................................................................18

*Cope v. Heltsley*,
 128 F.3d 452 (6th Cir. 1997).................................................................12

*Farm Labor Organizing Comm. v. Ohio State Highway Patrol*,
 308 F.3d 523 (6th Cir. 2002).................................................................18

*Firestone v. Rice*,
 71 Mich 377 (1888)...............................................................................24

*Ghandi v. Police Dep't of the City of Detroit,*
    747 F.2d 338 (6th Cir. 1984)) ...............................................................................13

*Griffin v. Breckenridge,*
    403 U.S. 88 (1971)...............................................................................................18

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)..............................................................................................11

*Hunter v. Bryant,*
    502 U.S. 224 (1991)..............................................................................................11

*Loesel v. City of Frankenmuth,*
    692 F.3d 452 ........................................................................................................18

*Mack v. City of Detroit,*
    649 N.W.2d 47 (Mich. 2002) ............................................................................... 20

*Malley v. Biggs,*
    475 U.S. 335 (1986) ............................................................................................ 11

*Odom v. Wayne County,*
    482 Mich. 459 (2008) .................................................................................... 20, 21

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ............................................................................... 11, 12, 20

*People v. Cameron,*
    291 Mich. App. 599 (2011)..................................................................................23

*People v. Datema,*
    448 Mich 585 (1995)............................................................................................23

*People v. Reeves,*
    458 Mich. 236 (1998)...........................................................................................23

*People v. Starks,*
    473 Mich. 227 (2005)...........................................................................................23

*People v. Terry,*
    217 Mich. App. 660 (1996)...................................................................................23

*Pray v. City of Sandusky,*
    49 F.3d 1154 (6th Cir. 1995) .................................................................. 12

*Ray v. Swager,*
    501 Mich. 52 (2017) ............................................................................. 25

*Robinson v. City of Detroit,*
    462 Mich. 439 (2000) ............................................................................ 25

*Ross v. Consumers Power Co. (on Rehearing),*
    420 Mich. 567 (1984) ....................................................................... 19-22

*Ross v. Duggan,*
    402 F.3d 575 (6th Cir. 2004) ................................................................ 18

*Saucier v. Katz,*
    533 U.S. 194 (2001) ...................................................................... viii, 12

*Siegert v. Gilley,*
    500 U.S. 226 (1991) ............................................................................. 11

*Smith v. Stolberg,*
    231 Mich. App. 256 (1998) .................................................................. 24

*Sudul v Hamtramck,*
    221 Mich App 455 (1997) .................................................................... 24

*Turner v. Scott,*
    119 F.3d 425 (6th Cir. 1997) ................................................................ 14

*United Bhd. of Carpenters, Local 610 v. Scott,*
    463 U.S. 825 (1983) ............................................................................. 18

*VonVorous v Burmeister,*
    262 Mich App 467 (2004) .................................................................... 24

*White v. Beasley,*
    453 Mich. 308 (1996) ........................................................................... 22

**Statutes**

42 U.S.C. § 1985(3) ...................................................................17

Mich. Comp. Laws § 691.1401 *et seq.* ....................................25

**Other Authorities**

Webster's Third New International Dictionary, Unabridged (2002).........................29

**Constitutional Provisions**

Fourth Amendment ........................................................... 14, 17

## CONCISE STATEMENT OF ISSUES PRESENTED

1.     Qualified immunity doctrine requires direct individual participation in deprivation of a clearly established constitutional right.  As driver of the pursuit car, Berger had no notice of or opportunity to prevent his partner's split-second decision to use deadly force.  Is Berger entitled to qualified immunity against the Fourth Amendment excessive force claim?

2.     A civil conspiracy claim requires a showing that two or more persons conspired for the purpose of depriving the claimant of the equal protection of the laws due to racial or class-based animus, the conspirators committed an act in furtherance of the conspiracy, and the claimant suffered an injury.  The facts of this case fail to demonstrate these requirements. Are Berger and Liss entitled to qualified immunity against the federal civil conspiracy claim?

3.     Under Michigan law, assault and battery requires intentional offensive touching of another person.  As driver of the pursuit car, Berger did not assault or batter Grimes.  Is Berger entitled to governmental immunity against the assault and battery claim?

4.     Gross negligence is not a standalone claim under Michigan law and in any event requires several elements to overcome governmental immunity, including a heightened causation standard.  On this record, the estate cannot meet these requirements.  Are Berger and Liss entitled to governmental immunity against the gross negligence claims?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*:   *Betzak Land Co. v. City of Detroit,* 298 F.3d 559 (6th Cir. 2002).

*Center for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011)

*Dorsey v. Barber*, 517 F.3d 389 (6th Cir. 2008)

*Mack v. City of Detroit*, 467 Mich. 186 (2002)

*Malley v. Biggs*, 475 U.S. 335 (1986)

*Odom v. Wayne County*, 482 Mich. 459 (2008)

*Pearson v. Callahan*, 555 U.S. 223 (2009)

*People v. Starks*, 473 Mich. 227 (2005)

*Saucier v. Katz*, 533 U.S. 194 (2001)

*Sudul v. Hamtramck*, 221 Mich. App. 455 (1997)

*Turner v. Scott*, 119 F.3d 425 (6th Cir. 1997)

*VonVorous v. Burmeister*, 262 Mich. App. 467 (2004)

42 U.S.C. § 1985(3)

Mich. Comp. Laws § 691.1401 *et seq*.

## INTRODUCTION

Proximity to a tragic outcome is not the same as legal liability.  The death of a fifteen-year-old in Detroit during a police chase cries for a remedy.  But under applicable law, the remedy sought here is not proper.  Qualified and governmental immunity doctrines require direct participation on an individual basis in the harm.  This requirement exists as a matter of fairness and good public policy.

In this case, the Estate of Damon Grimes cannot overcome applicable immunity for Defendants Ethan Berger or Jacob Liss.  The failure to intervene theory against Berger, the driver of the pursuit car, lacks an adequate factual basis.  The facts are known and beyond dispute, marshalled through copious discovery that includes available dashboard video, deposition testimony, and the underlying criminal investigation and prosecution.

These facts demonstrate that Berger had inadequate notice of or opportunity to prevent his partner Mark Bessner's split-second decision to deploy a taser from a moving patrol car at Grimes while Grimes was still driving an all-terrain vehicle (ATV).  Even if causation is presumed, Berger's alleged failure to intervene is illusory and otherwise not such that he violated any of Grimes's clearly established rights.  Speculative, retrospective inferences about what Berger might have done with advance knowledge he plainly lacked simply cannot take the place of required affirmative evidence that would deny him the protections of qualified immunity.

For similar reasons, the civil federal conspiracy claim and the state law claims against Defendants should also be dismissed.

For Liss, the theory of liability is also unfounded. He merely responded to the scene after the use of force and allegedly mishandled taser wire evidence. But the supposed evidence was not material to the investigation or the prosecution. And it was promptly recovered, without any suggestion on this record that any of its limited evidentiary value was somehow lost. Liss, in short, breached no duty that caused any harm to the estate. He is thus entitled to immunity from suit.

## STATEMENT OF FACTS

**The initiation of the vehicle pursuit.**

At about 5:30 p.m. on Saturday, August 26, 2017, Defendant Ethan Berger was on patrol in the city of Detroit, driving a fully marked Michigan State Police Patrol vehicle. His partner, Mark Bessner, was riding in the passenger seat. Berger saw Grimes "driving in a reckless manner on Reno . . . ." (Berger Dep. at 37, Defs' Ex. 1.) He saw Grimes "pop a wheelie" for about two seconds. (Berger Dep. at 43, 54, 136.) Grimes revved his engine and placed his front tires in the air for a short period of time.

Berger pursued Grimes because Grimes did not stop despite the loud sirens on Berger's patrol car. (Berger Dep. at 38.)

> Q:    Explain what Mr. Grimes was doing that led you to believe that he was driving directly towards you in a challenging manner.

2

A.      As I was going northbound, he was coming southbound at me at a high rate of speed and he continued.  He continued to come right towards my vehicle, my patrol vehicle, and almost like playing a game of chicken, if you're familiar.  That, to me, is a challenging – a challenge.  (Berger Dep. at 67.)

Berger had angled his patrol car so that Grimes could see he was driving at a marked police car.  (Berger Dep. at 136.)  But Grimes continued driving southbound towards Berger.  (Berger Dep. at 136-137.)  Berger also observed Grimes sharply turning off at the last moment, narrowly avoiding a collision with the patrol car.  (Berger Dep. at 137.)  "It was not a lot of clearance, maybe a couple feet."  (Berger Dep. at 137.)

Grimes appeared 6'2" or 6'3" tall, about 250lbs, and in his mid to late twenties to Berger.  (Berger Dep. at 137.)  He was in fact fifteen years old and about to start the ninth grade.

Berger made a U-turn and pursued Grimes.  (Berger Dep. at 138.)  Before the crash, Grimes never came to a stop during the pursuit.  (Berger Dep. at 138.)  He ran through a yield and a stop sign.  (Berger Dep. at 138-139.)

**Objective video evidence.**

Berger's dashboard video recorded a pursuit that lasted less than a minute. The video begins with Berger driving northbound on Reno in his marked patrol car. (00:00 – 00:21, MSP Dashboard Video, Defs' Ex. 2.)  Grimes appeared in the distance on the roadway and drove towards Berger.  (00:21 – 00:23.)  A few car

3

lengths in front of Berger, Grimes suddenly veered the ATV across the roadway,

violating Berger's right of way, and zipping by the front passenger side of the patrol

car with little room to spare.  (00:24 – 00:26.)

Berger completed a U-turn, activated his sirens, and pursued Grimes.  (00:27

– 00:31.)[1]  Berger turned left/eastbound onto Rossini.  (00:32 – 00:40.)  Berger

closed some of the distance to the ATV.  (00:41 – 00:46.)  About 35mph is called

out over the radio as the speed of the pursuit.  (00:46.)  Grimes drove through an

intersection and disregarded a yield sign.  (00:47 – 00:48.)  Grimes slowed down

and then accelerated, disregarding a stop sign at another intersection.  (00:49 –

01:09.)  A speed of about 35mph is again called out over the radio.  (00:59.)  Grimes

also passed a fully marked Detroit Police Department patrol car going in the

opposite direction, with lights flashing on the DPD car.  (01:04 – 01:08.)  At the

01:04 mark, Berger said "get ready" to Bessner.  (01:04.)

Berger again closed the distance to the ATV, pulling up along the left side of

Grimes.  (01:09 – 01:16.)  The vehicles passed parked vehicles on the right and

rapidly approached the intersection with Gratiot Avenue, a major street.  (01:16 –

01:18.)  Grimes's ATV appeared to turn sharply to the right and out of frame, at

which point it crashed into the back of a parked pickup truck.  (01:18 – 01:20.)

Grimes crashed into the last parked vehicle on the street, a few houses from the

---

[1] At this point, audio begins to record on the video system as well.

intersection with Gratiot.  Had the ATV not turned, there was adequate space between the patrol car and the parked pickup truck for the ATV to continue down the road.  Berger parked the patrol car and he and his partner exited, calling out the crash and requesting immediate medical care.  (01:21 – 01:44.)

**Berger's description of the pursuit.**

Berger denied knowing in advance that Bessner would tase Grimes.  (Berger Dep. at 27.)  "I did not see that, but assuming I saw that, I would tell him, yes, don't tase him while we're moving."  (*Id.* at 28.)  Bessner's firearm was on his right side and his taser on his left side, which meant a cross-draw for Bessner to unholster his taser with his right hand.  (*Id.* at 30.)

Berger did not see Bessner roll down or lean out of his window during the pursuit.  (Berger Dep. at 31.)  Berger never saw Bessner draw his taser.  (*Id.* at 140.)  Berger also denied seeing Bessner aim his taser out the window.  (*Id.* at 35, 140-141.)  He denied having any advance notice that Bessner would deploy the taser from a moving vehicle at a subject on another moving vehicle.

Q:      When you heard the pop of the taser, did that come as a complete surprise to you?

A:      Yes.  (*Id.* at 141.)

"[W]hen you're driving a patrol in a pursuit, you've got tunnel vision.  You're paying attention to other things other than what your partner to your right is doing."

5

(*Id.* at 35.)  The crash came very shortly after the pop of the taser.  (*Id*. at 141.)

Berger further testified that troopers often draw a weapon to keep in a ready

position, not pointed at anyone but to increase reaction time and to have it ready for

a foot pursuit.  (*Id.*  at 142.)

Berger was also asked multiple times about what he meant when he told

Bessner to get ready.

Q:    Get ready for what?

A:    Well, we were coming up on Gratiot Avenue.  I saw fields off to our right.  I thought the person might bail or something was about to happen. (Berger Dep. at 35.)

\*\*\*

Q:    And so we're clear, it's your testimony that when you said "get ready, get ready", it had nothing to do with Trooper Bessner tasing Mr. Grimes?

A:    True.  (Berger Dep. at 107.)

\*\*\*

Q.    And what did you mean to [Bessner] when you said, "get ready"?

A.    I knew something had to happen with Grimes and where he was going or how he was going to continue – or how we were going to continue this chase.·  We were approaching Gratiot Avenue, a heavily congested area, and we were also approaching a field kind of near the Rossini/Gratiot interaction. And I was just telling Mark to be aware, we're not going to keep going straight forever.  Something's going to change up here.

Q.    So it could have been get ready for a foot pursuit?

A.    Yep.

Q.    It could have meant get ready for a higher level of threat?

A.    Higher level of threat, change of direction.  (Berger Dep. at 139-140.)

Berger heard the crash but he did not see it.  (*Id.* at 39.)  He did not realize Grimes

was tasered until after Berger saw taser wiring on the ground near the crash scene.

(*Id.*)  As a result of the crash, Grimes died due to blunt force trauma to the head.

**Jacob Liss's limited involvement with the investigation.**

Jacob Liss, a sergeant at the time and the direct supervisor of Berger and Liss,

responded to the scene shortly after the crash.  (Berger Dep. at 23.)  Liss retrieved

the dashboard video from Berger's patrol car.  (Liss Dep. at 52, Defs' Ex. 3.)  Liss

also took custody of Bessner's taser and downloaded the data from its internal

memory.  (*Id.* at 51, 55-56.)  Instead of the usual five-second burst, the data

indicated two seconds of activation.  (*Id.* at 56-58.)

Later in the day, back at MSP's detachment, Trooper Michael Klenner came

from the crash scene and gave Liss "a rolled-up wad of Taser wire and a rubber

glove that contained a bloody piece of paper, earbud and I think maybe a broken

chain."  (Liss Dep. at 17.)  Trooper Christopher Kurish also arrived "with a bag full

of bloody gauze and stuff that they had cleaned up from the scene and police tape."

(*Id.*)  "I was under the impression that this was all trash that was cleaned up from the

scene."  (*Id.*)  Liss placed the taser wire in a trash can in the detachment.  (*Id.* at 42.)

Liss testified that the taser cartridges are rated for a distance of twenty-five

feet.  (Liss Dep. at 62.)  The wires are brittle, prone to break apart, disposable, and

not designed to be used again.  (*Id.*)  In Liss's experience, taser wires after they are used are typically collected and thrown away.  (*Id.*)  Never in his experience have taser wires been marked, bagged, and used as evidence in a criminal investigation. (*Id.* at 63-64.)  At this scene, Liss observed a couple long strands of wire, plus some smaller broken strands laying around the scene.  (*Id.* at 64.)

The taser wire was retrieved from the same trash can on the next day.  (Liss Dep. at 25, 65.)  Liss was not aware of any suggestion that the wires were contaminated or degraded in any way.  (*Id.* at 65.)  Liss was not charged by the prosecutor for mishandling of evidence.  (*Id.*)

### MSP conducted a thorough investigation, found no attempt to cover up the taser use.

D/F/Lt. Thomas DeClercq, commander of the special investigation section, supervises about twenty MSP detectives.  (DeClercq Dep. at 9, Defs' Ex. 4.)  He was the officer in charge of the Grimes investigation.  (*Id.*)  He concluded that Liss was not attempting to be deceptive when the taser wires were placed in the trash. (*Id.* at 17.)  Based upon the totality of the circumstances, "there was no effort to conceal taser wire."  (*Id.* at 18.)  DeClercq further noted that the deployment of the taser was called out over the radio, and the data from the taser download report was preserved.  (*Id.* at 18, 27.)  In addition, the taser probes at the end of the wires were

not tampered with and were examined as part of the autopsy and the criminal investigation.  (*Id.* at 19.)

**Bessner is criminally charged, convicted, and sentenced.**

The Wayne County prosecutor declined to file any charges against Berger or Liss.  The prosecutor did charge Bessner, who resigned from MSP shortly after the incident, with one count of second degree murder and two counts of involuntary manslaughter.  His first trial ended in a hung jury.  He testified that, just before the taser deployment, he unbuckled his seat belt and with his right hand cross-drew his taser, holding it in a ready position near his right leg.  (Criminal Trial Transcript at 46, Defs' Ex. 5.)[2]  Bessner saw Grimes "reach for his waistband again" and made "eye contact with him."  (*Id.* at 47.)

> Q:     And as a result of that, what did you do?
>
> A:     I did the only thing that I thought I could do at the time, and that was I deployed the weapon that was in my hand.  (*Id.*)

Bessner believed it was a deadly force situation.  (*Id.* at 48.)[3]  (<u>should be 48</u>)

> Q:     How long did it take you, sir, to come to that decision?

_____

[2] Defendant Bessner has not appeared in this case or attempted to defend against the claims brought in this lawsuit.  Counsel for the other parties attempted to depose him after he was incarcerated.  Bessner invoked his Fifth Amendment rights and refused to answer questions.

[3] Berger testified that his partner provided the same explanation shortly after the use of force.  "[Bessner] was fearful that Grimes was armed and Trooper Bessner had told me that he saw Grimes reach for his waistband."  (Berger Dep. at 40.)

A:     It was like that.  It was – it was a split second.  I didn't have any time to make the decision.  (*Id.*)

At his retrial, Bessner did not testify and the jury convicted him of involuntary manslaughter.  He is serving a sentence of 5-15 years.

**The claims of the estate.**

The Grimes estate has brought multiple claims.  Count I alleges excessive force against Bessner and Berger.  (Second Am. Compl., ¶¶ 40-48.)  Count II alleges gross negligence against Bessner, Berger, and Liss.  (*Id.*, ¶¶ 49-57.)  Count III alleges assault and battery against Bessner and Berger.  (*Id*., ¶¶ 58-65.)  Finally, Count IV alleges conspiracy by Bessner, Berger, and Liss to deprive and interfere with Plaintiff's civil rights.  (*Id*., ¶¶ 66-73.)  For the reasons stated below, none of these claims can overcome applicable immunity doctrine.

## ARGUMENT

I.    **Berger and Liss receive the protections of qualified immunity because they did not violate any clearly established rights.**

A.    **Qualified immunity is a threshold legal defense that is broad in its application and scope.**

The doctrine of qualified immunity is not merely a defense to liability but also a shield for public officials against the burdens of litigation and trial.  *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (collecting cases).  "Accordingly, 'we

10

repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " *Pearson*, 555 U.S. at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  Qualified immunity is designed to "spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Biggs*, 475 U.S. 335, 341 (1986).

Qualified immunity analysis consists of two distinct inquiries.  *Saucier v. Katz*, 533 U.S. 194 (2001).  Typically, a court must determine whether, taken in a light most favorable to the plaintiff, the facts alleged demonstrate that the officer violated a constitutional right.  *Id.* at 201.  If the court determines that a constitutional deprivation has been properly alleged, it must determine whether the right was clearly established as viewed within the specific context of the facts of the case.  *Id*.  The Supreme Court held that this order of inquiry is not mandatory, allowing courts "to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The Sixth Circuit has observed that the qualified immunity doctrine "requires the courts to examine the asserted right at a relatively high level of specificity." *Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir. 1997). "The right must have been 'clearly established' not just in an abstract sense, but in a 'particularized' sense." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Claims of immunity are thus to be analyzed 'on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful.' " *Id.* at 458–59 (quoting *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995)). "[T]he burden of convincing the court that the law was clearly established under this particularized 'could have believed' test is a burden that rests squarely on the plaintiff." *Id.* at 459. Moreover, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Id.* (emphasis in original) (internal quotes and citations omitted). "Although the focus of the clearly established prong is whether the official had notice that his alleged conduct was improper, we have determined that qualified

immunity is an objective rather than a subjective inquiry." *Baynes v. Cleland*, 799

F.3d 600, 610–11 (6th Cir. 2015).

### B.    There is no viable excessive force claim against Berger.

Liability for each defendant must be assessed individually on the basis of

that's defendant's own actions. *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir.

2008) (citing *Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 352 (6th

Cir. 1984)).  Accordingly, no defendant may be held liable for the actions of any

other persons.  The estate must meet its burden of specifically attributing any

unconstitutional act to Berger.  *Burley v. Gagacki*, 834 F.3d 606, 615 (6th Cir.

2016).  Any plaintiff "must be able to identify with particularity the individual who

engaged in the alleged misconduct because an individual is only liable for his or her

own misconduct." *Id.* (quotation omitted).

In this case, Berger is at least two cavernous steps removed from the estate's

theory of liability for excessive force.  The harm alleged is (1) a fatal crash, (2)

caused by Bessner's taser deployment, and (3) not prevented somehow by Berger.

For this theory to survive summary judgment, the estate must present affirmative

evidence that supports a failure to intervene theory under the Fourth Amendment.

A failure to intervene claim exists when "(1) the officer observed or had

reason to know that excessive force would be or was being used, and (2) the officer

had both the opportunity and the means to prevent the harm from occurring."

*Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  The classic example is a prolonged beating of a handcuffed and compliant suspect by police while one or more officers within a short distance stands idly by and says and does nothing to stop the beating.

In this case, the estate falls short of demonstrating both required elements for a failure to intervene claim.  First, Berger did not observe or have reason to know that an unlawful use of the taser was about to happen.  Berger himself testified the deployment of the taser from the moving patrol car came as a complete surprise to him when he first heard the pop of the taser a split-second before the crash.  His attention was rightly focused elsewhere, and particularly on driving the patrol car as safely as he could under the tense and rapidly unfolding moments of the pursuit.  He referred to this dynamic as tunnel vision, which is a recognized biological phenomenon for any human being faced with the kind of situation that was presented here.[4]

To counter, the estate has no affirmative evidence, only bald assertion, unreasonable inferences, and blanket denial of the truth of Berger's testimony.  But simple disbelief of disadvantageous evidence is not sufficient as a matter of law to overcome qualified immunity.

---

[4] For examples of ample social science that support this point, see Exhibits 2 and 3 to Defendants' June 7, 2019 Response Brief.  (R. 102-3 & 102-4.)

Further, even if Berger is disbelieved, there is other evidence that entitles Berger to qualified immunity.  The dashboard video is objective evidence that the entire chase lasted fewer than sixty seconds.  The critical moments before the crash were even more fleeting – a split-second at best, and not even a handful of seconds at worst.  Bessner testified that he made his deadly force decision to deploy the taser in a split-second.

Even if it can be assumed that Berger saw or should have seen Bessner unholster the taser, there is still no affirmative evidence that Berger saw his partner aim the taser at Grimes, lean out the window, or otherwise signal that a constitutional violation was about to happen.  In the context of a vehicle pursuit, the passenger officer is in the jump seat and he would be the one to rapidly exit the car and begin a foot pursuit.  Having a weapon at the ready would be good police work, and not an affirmative fact that would predict an unforeseeable, deadly deployment of the taser from a moving vehicle.

Relatedly, Berger's mere act of driving close to Grimes is also not enough to meet the estate's burden.  Again, it is good police work to get close to a fleeing vehicle, for several reasons.  It increases the effectiveness of the chase while minimizing the chance that the fleeing individual will escape.  It allows for better video recording of what happened during the chase, and what identifying information (license plates, clothing, hairstyle, physical characteristics, tattoos, etc.)

15

can be had in case the individual gets away.  Finally, it gives the partner in the jump seat a shorter distance to close if, as often happens, the vehicle pursuit becomes a foot chase once the suspect ditches the vehicle, enters an area where the patrol car cannot follow, etc.

Berger's utterance of "get ready" to Bessner during the chase is also not adequate evidence for overcoming qualified immunity.  Berger explained what he meant and by no means did it mean prepare to deploy the taser.  To conclude otherwise is to simply posit a constitutional violation without affirmative evidence in support.  By the same logic, silence during the same chase would be acquiescence in the ultimate constitutional violation.  That is not and has never been the standard for a failure to intervene claim.

At bottom, the estate's theory presumes Berger had advance knowledge and an opportunity to stop what happened.  But that is an unfounded, retrospective view of the case.  The standard is not 20/20 hindsight.  Mere "but for" analysis is also inadequate – i.e. "but for" Berger's manner of driving the patrol car and not braking before coming near the parked pick-up truck.  Nor should it be assumed that Berger had a crystal ball that would have told him to hit the brakes and get Grimes out of the range of the taser.  On this record, Berger had no notice, opportunity, or means to prevent the harm that occurred.  Accordingly, qualified immunity protects him against any Fourth Amendment excessive force claim.

### C.    There was no conspiracy to deny any civil rights.

The estate also brings a federal civil conspiracy claim under 42 U.S.C. § 1985(3).  In essence, this claim alleges that Grimes was denied equal protection of the law on the basis of race due to alleged delay in rendering first aid and purported attempts to conceal the use of the taser.  (Second Am. Compl., ¶¶ 67-73.)  This claim must fail as a matter of law for several reasons.

First, without an underlying constitutional violation, there can be no viable conspiracy claim.  *See Betzak Land Co. v. City of Detroit,* 298 F.3d 559, 569 (6th Cir. 2002).  Even if such a violation is assumed here, the estate must show that (1) two or more persons conspired (2) for the purpose of depriving the claimant of the equal protection of the laws due to racial or class-based animus, (3) the conspirators committed an act in furtherance of the object of such conspiracy, and (4) the claimant suffered an injury. 42 U.S.C. § 1985(3); *see United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983).

The Supreme Court has stated that "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Bartell v. Lohiser*, 215 F.3d 550, 559–60 (6th Cir. 2000).  "Animus comes into play only when no rational reason being imaginable for injurious action taken by

17

defendant against plaintiff, the action would be inexplicable but for animus." *Ross v. Duggan*, 402 F.3d 575, 589 (6th Cir. 2004). "Animus is defined as 'ill will, antagonism, or hostility usually controlled but deep-seated and sometimes virulent.'" *Loesel v. City of Frankenmuth*, 692 F.3d 452, 466 (citing Webster's Third New International Dictionary, Unabridged (2002)); s*ee also Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002); *Center for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotations omitted). The threshold element of an equal protection claim, therefore, is disparate treatment. *Center for Bio–Ethical Reform, Inc*., 648 F.3d at 379.

Here, there is an absolute lack of evidence that Berger or Liss ever took any unlawful action against Grimes on account of race. There is also no evidence that either of them ever conspired with each other or with anyone else to do any harm to Grimes. Liss was not even present for the use of force. For the reasons already stated with respect to failure to intervene, Berger was not part of any joint plan to harm Grimes during the chase or while an ambulance was on its way.

Nor is there any evidence of conspiratorial harm to Grimes or the estate in the aftermath of the use of force. Liss and Berger both cooperated with the investigation. Berger, consistent with protocol, was removed from the scene and had no part in evidence collection. Liss's role was limited and caused no harm in the end. The so-called taser wire evidence was that in name only and it was

18

recovered intact.  MSP copiously documented the scene and presented a thorough and complete investigative file to the prosecutor, who then made charging decisions. Bessner was charged, bound over, tried, convicted, and sentenced.  Berger and Liss's involvement in the scene, the investigation, report-writing, and the like, had no ill effect whatsoever on the process or the ultimate outcome.  Accordingly, there is no genuine question of material fact concerning denial of equal protection. Qualified immunity shields Berger and Liss against any civil conspiracy claim.

## II.   The state law claims fail as a matter of law under governmental immunity doctrine.

### A.   Governmental immunity under Michigan law also provides a threshold legal defense that is broad in its application and scope.

Governmental immunity under Michigan law, like qualified immunity under federal law, is a threshold legal issue that ought to be decided at the earliest juncture. *See*, *e.g.*, *Mack v. City of Detroit*, 467 Mich. 186, 190 (2002). ("Governmental immunity is a characteristic of government and thus a plaintiff must plead her case in avoidance of immunity."); *see also Pearson*, 555 U.S. at 232.

In *Odom v. Wayne County*, 482 Mich. 459, 461-462 (2008), the Michigan Supreme Court determined that the immunity from intentional tort liability given to lower-level governmental officials was not extinguished by adoption of the "gross negligence" standard in Mich. Comp. Laws § 691.1407(2).  Specifically, the *Odom* court reaffirmed and restated the *Ross v. Consumers Power Co.* test as the standard

for providing governmental employees qualified immunity from intentional tort liability. *Ross v. Consumers Power Co. (on Rehearing),* 420 Mich. 567 (1984).

Under the *Ross* test, lower level officials, employees, and agents are immune from intentional tort liability when they are:

> 1. acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority;
>
> 2. acting in good faith; and
>
> 3. performing discretionary, as opposed to ministerial acts. *Odom,* 482 Mich. at 472 (citing *Ross,* 420 Mich. at 633).

Here, the first element is met, as the claims arise out of Berger and Liss's official duties as police officers.

The third element is also met because, by definition, the investigatory police work challenged here is discretionary and not ministerial or operational. These actions and decisions are the very essence of the discretion and judgment routinely and regularly exercised by both law enforcement officers.

There is also no question about the second element – Defendants' good faith. Under *Odom*, "there is no immunity when the governmental employee acts maliciously or with a wanton or reckless disregard of the rights of another." *Odom*, 482 Mich. at 474 (footnote and emphasis omitted). Such "'willful and wanton misconduct is made out *only if* the conduct alleged shows an *intent to harm* or, if not

that, such indifference to whether harm will result as to be the equivalent of a willingness that it does.'" *Id.* at 475, (quoting *Burnett v. City of Adrian,* 414 Mich. 448, 455 (1982) (emphasis added)).

Unlike qualified immunity under federal law, which uses an objective standard, "[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Bletz v. Gribble*, 641 F.3d 743, 754, 757-758 (6th Cir. 2011) (citations omitted). The Michigan Supreme Court has recognized "that police officers are employed to work in a milieu of criminal activity where every decision is fraught with uncertainty." *White v. Beasley*, 453 Mich. 308, 321 (1996)(citation omitted). Indeed, Michigan law affords officers greater protection than federal law. *Id.* "Police officers must work in unusual circumstances. They deserve unusual protection." *White*, 453 Mich. at 321, (1996). As a result, and "because of the unusual and extraordinary nature of police work it is unfair to allow a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's discretionary professional duty." *Id.* "Police officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public,

the cessation of unlawful conduct, and the apprehension of wrongdoers." *Ross*, 420 Mich. at 659.

The facts of this case demonstrate, in spite of the tragic outcome, that Berger acted in good faith. He had every right to initiate the pursuit. Any purported failure to intervene is not, standing alone, a demonstration of bad faith by Berger. For the reasons already stated above, he cannot be reasonably expected to have prevented what happened in this brief pursuit and his partner's split-second decision to use deadly force.

Similarly, the facts of this case also show that Liss acted in good faith. He had no reason to treat the taser wires as evidence that needed to be logged and maintained. It was not marked or bagged as evidence. In his experience, it was road debris that required no special treatment. Moreover, it was recovered within hours and without any hint of spoliation or harm to the investigation and, by extension, the estate. He is therefore entitled to governmental immunity.

### B. There is no viable assault and battery claim against Berger.

"A battery is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *People v. Reeves*, 458 Mich. 236, 240 n.4 (1998). Because an attempt to commit a battery will establish an assault, *People v. Starks*, 473 Mich. 227, 234 (2005), "every battery necessarily includes an assault because a battery is the very 'consummation of the

22

assault.'" *People v. Cameron*, 291 Mich. App. 599, 614 (2011) (citation omitted).

While the common law did not require proof of intent, Michigan requires proving

the "intent to injure in order to establish an assault and battery." *People v. Datema*,

448 Mich 585, 599 (1995). "The intent of the defendant may be established by

circumstantial evidence." *People v. Terry*, 217 Mich. App. 660, 663 (1996).

Police officers may use reasonable force when making an arrest. *Brewer v*

*Perrin*, 132 Mich App 520, 528 (1984) (citing *Firestone v. Rice*, 71 Mich 377

(1888)). The measure of necessary force is that which an ordinarily prudent and

intelligent person, with the knowledge and in the situation of the arresting officer,

would have deemed necessary. *Id*. at 528-529 (quotation omitted).

Here, Berger simply cannot be liable for assault and battery. He drove the

pursuit car. He did not assault or batter Grimes. For the reasons already briefed, he

is entitled to governmental immunity for this claim.

### C.    Gross negligence is not a recognized standalone claim and in any event cannot be shown here.

Michigan courts have long "rejected attempts to transform claims involving

elements of intentional torts into claims of gross negligence." *VonVorous v.*

*Burmeister*, 262 Mich. App. 467, 483-84 (2004), citing *Smith v. Stolberg*, 231 Mich.

App. 256, 258-59 (1998); *Sudul v. Hamtramck*, 221 Mich. App. 455, 458, 477

(1997).  For example, there is no such thing under Michigan law as assault and battery by gross negligence.  *Sudul*, 226 Mich. App. at 461.

Here, the estate alleges intentional misconduct, not gross negligence.  The four corners of the complaint do not paint a picture that some grave mistake was made or that anything was done with a reckless disregard for whether anyone would be harmed.  The police work that is implicated is, by its nature, discretionary and done with a purpose.  The gravamen of the complaint is that the harm to Grimes was done on purpose.  Accordingly, the estate simply has no claim for gross negligence.

Even if such a claim exists in theory, it cannot proceed on this record.  For the reasons already argued, there is no basis for concluding that Berger or Liss were grossly negligent in any material way here.

The estate also has a heightened burden for proving "the proximate cause" under Michigan's Governmental Tort Liability Act.  Mich. Comp. Laws § 691.1401 *et seq*.  Under that law, "a proper proximate cause analysis must assess foreseeability and the legal responsibility of the relevant actors to determine whether the conduct of a government actor, or some other person, was 'the proximate cause,' that is, as our caselaw has described it, 'the one most immediate, efficient, and direct cause' of the plaintiff's injuries."  *Ray v. Swager*, 501 Mich. 52, 58 (2017); *see also Robinson v. City of Detroit*, 462 Mich. 439 (2000).  Here, the estate can prove no set of facts that casts any of the conduct of Berger or Liss as the one most immediate,

efficient, and direct cause of the injuries alleged.  Accordingly, governmental immunity stands in the way of any gross negligence claim here.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, Defendants Berger and Liss request that this Court (1) grant qualified immunity, (2) grant governmental immunity, (3) dismiss all claims against Defendants, and (4) grant any other appropriate relief.

Respectfully submitted,

Dana Nessel
Attorney General

*/s/ John G. Fedynsky*
John G. Fedynsky (P65232)
Mark E. Donnelly (P39281)
Joseph T. Froehlich (P71887)
Assistant Attorneys General
Attorneys for Defs. Berger and Liss
Michigan Dep't of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
fedynskyj@michigan.gov
donnellym@michigan.gov
froehlichj1@michigan.gov

Dated:  November 7, 2019

## CERTIFICATE OF SERVICE

I certify that on November 7, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will provide electronic copies to counsel of record.

/s/ John G. Fedynsky
John G. Fedynsky (P65232)
Assistant Attorney General

26