UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONIQUE GRIMES, as Personal
Representative of the Estate of             No. 2:17-cv-12860
Damon Grimes, deceased

        Plaintiff,                           *consolidated with*

                                            Case No. 17-cv-13580

v

                                            HON. GERSHWIN A. DRAIN

TROOPER MARK BESSNER,
TROOPER ETHAN BERGER, and           MAG. ELIZABETH A. STAFFORD
SGT. JACOB LISS,

        Defendants.

---

| | |
|---|---|
| Geoffrey N. Fieger (P30441) | John G. Fedynsky (P65232) |
| James J. Harrington IV (P65351) | Mark E. Donnelly (P39281) |
| Danielle L. Dezbor (P79488) | Joseph T. Froehlich (P71887) |
| Stephanie L. Arndt (P66870) | Assistant Attorneys General |
| Fieger, Fieger, Kenney & Harrington, P.C. | Attorneys for Defs. Berger and Liss |
| Attorneys for Plaintiff | Michigan Dep't of Attorney General |
| 19390 W. 10 Mile Road | State Operations Division |
| Southfield, MI 48075 | P.O. Box 30754 |
| (248) 355-5555 | Lansing, MI 48909 |
| g.fieger@fiegerlaw.com | (517) 335-7573 |
| j.harrington@fiegerlaw.com | fedynskyj@michigan.gov |
| d.dezbor@fiegerlaw.com | donnellym@michigan.gov |
| s.arndt@fiegerlaw.com | froehlichj1@michigan.gov |

---

**Exhibit 1**

Excerpts of Ethan Berger's deposition transcript

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4

 5    MONIQUE GRIMES, as Personal

 6    Representative of the Estate of

 7    DAMON GRIMES, Deceased,

 8                    Plaintiff,

 9         vs.                      Case No. 17-cv-12860

10                                 Hon. Gershwin A. Drain

11    TROOPER MARK BESSNER,

12    TROOPER ETHAN BERGER, and

13    SGT JACOB LISS,

14                    Defendants.

15    _____

16

17

18       The Deposition of TROOPER ETHAN BERGER,

19       Taken at 14350 Ten Mile Road,

20       Oak Park, Michigan,

21       Commencing at 10:09 a.m.,

22       Friday, December 7, 2018,

23       Before Corissa Bakko, CSR-8346.

24

25
```

BERGER, TROOPER ETHAN
12/07/2018                                                          Page 23

```
 1        the Michigan State Police, correct?

 2    A.  Yes, sir.

 3    Q.  And at any time, was there anything written in there

 4        by any supervisor that you would deem as a negative

 5        write-up?

 6    A.  No.

 7    Q.  Was everything in there a hundred percent positive?

 8    A.  A hundred percent, no, but the parts that weren't

 9        positive were maybe memos or notes to, hey, how about

10        you try focusing on this or that.

11    Q.  Okay.  So I'm not trying to put words in your mouth,

12        if we were to go through it, the worst thing that we

13        would see would be let's say you handle a situation in

14        a particular way and the supervisor maybe has you

15        tweak it to make it just a little bit better, but it

16        wasn't like you really did anything bad, so to speak.

17        Is that a fair kind of lay person's interpretation of

18        what you're saying?

19    A.  That's fair.

20    Q.  And on October -- I apologize.  On August 26, 2017,

21        who was your direct supervisor?

22    A.  Jacob Liss.

23    Q.  And you've worked with -- and that's Sergeant Liss,

24        correct?

25    A.  Yes, sir.
```

BERGER, TROOPER ETHAN
12/07/2018                                                                                    Page 27

```
 1       you know what's going on, right?

 2  A.   Yes.

 3  Q.   And that you're in close enough proximity to stop it

 4       from happening?

 5  A.   Right.

 6  Q.   Or had the ability to stop it, whether it be by a

 7       verbal command or so forth?

 8  A.   Right.

 9  Q.   Okay.  Did you ever tell Trooper Bessner, don't Tase

10       him?

11  A.   No.

12  Q.   Did you ever put your hand on Trooper Bessner and try

13       to pull him away from the window so he didn't Tase

14       Mr. Grimes?

15  A.   No.

16  Q.   You agree with me that that's something that you could

17       have done is told him, one, don't Tase him?

18            MR. FEDYNSKY:  Object to form and the

19       foundation.

20            But go ahead.

21  A.   No, I don't.  You're --

22            MR. FEDYNSKY:  Go ahead.  Finish your

23       sentence.

24  A.   You're making it sound like I knew he was going to

25       Tase Mr. Grimes.
```

BERGER, TROOPER ETHAN
12/07/2018                                                    Page 28

```
 1    BY MR. HARRINGTON:

 2    Q.   All right.  So Mr. Grimes was to your right, correct?

 3    A.   Correct.

 4    Q.   Mr. Grimes was on an ATV, yes?

 5    A.   Right.

 6    Q.   He was on the street, Rossini, heading east towards

 7         Gratiot, yes?

 8    A.   Correct.

 9    Q.   Trooper Bessner was right next to you?

10    A.   Yes.

11    Q.   To your right?

12    A.   Yes.

13    Q.   If you would have seen Trooper Bessner pulling the

14         Taser out and let's just say you assume that you saw

15         that, would you have told him, don't Tase him?

16    A.   Assuming that I saw that.

17    Q.   Yes.

18    A.   I did not see that, but assuming that I saw that, I

19         would tell him, yes, don't Tase him while we're

20         moving.

21    Q.   All right.  And if he didn't listen to you and you saw

22         him with the Taser, what would have been the best

23         move?  Would it have been to grab him to stop or would

24         it have been slow the vehicle down and let Mr. Grimes

25         get a little further ahead?
```

1    A.    Like with his primary firearm?  Right-handed.

2    Q.    Okay.  So that means his firearm is on his right side?

3    A.    Yes.

4    Q.    And then the Taser is a cross draw?

5    A.    Yes.

6    Q.    So the cross draw would be Trooper Bessner would take

7          his right arm, pull out the Taser, come across his

8          body towards the window, correct?

9    A.    I don't recall where Trooper Bessner's Taser was.

10         Sometimes it's right on their buckle.  I don't recall

11         where Bessner's Taser was and how much he had to reach

12         across.

13   Q.    Are you right-handed?

14   A.    No.

15   Q.    You're left-handed?

16   A.    Yes, sir.

17   Q.    So if you did a cross draw, where do you keep your

18         Taser?

19   A.    I kept my Taser -- when I carried one, I kept it --

20         it's been a year and a half since putting on a

21         uniform, but I believe I kept it left of my magazine

22         pouch, so between my belly button and my flank, I

23         guess.

24   Q.    So assuming Trooper Bessner had to do a cross draw,

25         that would mean that he would bring his Taser from his

BERGER, TROOPER ETHAN
12/07/2018                                                              Page 31

```
 1        left side across his body to the window, correct?

 2   A.   Assuming he had the Taser all the way on his left

 3        side, yes.

 4   Q.   And that takes time to do that, correct?

 5   A.   It takes time to do anything, sir.

 6   Q.   I understand.  But the answer is what, yes or no?

 7   A.   Yes.

 8   Q.   Okay.  And do you remember Trooper Bessner rolling

 9        down the window at any time during the pursuit of

10        Mr. Grimes?

11   A.   No.

12   Q.   Did you ever see Trooper Bessner leaning out the

13        window of the patrol vehicle?

14   A.   No.

15   Q.   Do you wear glasses?

16   A.   Contacts.

17   Q.   With corrected vision, are you 20/20?

18   A.   I believe so.

19   Q.   Did you have contacts at the time of the Grimes

20        incident?

21   A.   Yes.

22   Q.   Were you wearing them?

23   A.   Yes.

24   Q.   Do you have peripheral vision?

25   A.   Yes.
```

BERGER, TROOPER ETHAN
12/07/2018                                                                    Page 35

```
 1   Q.   Your testimony is that -- let me ask you this.  Did
 2        you ever see Trooper Bessner take his Taser and aim it
 3        out the window?
 4   A.   No.
 5   Q.   You know that's what he did?
 6   A.   Well, yes.
 7   Q.   Why didn't you see that?
 8   A.   I don't even know how to answer that question.  Why
 9        didn't I see that?
10   Q.   How did you not see that?  It was happening directly
11        to your right.
12   A.   Well, apparently my peripheral vision is bad according
13        to you.  And, also, I could have been looking to the
14        left.  And when you're driving a patrol car in a
15        pursuit, you've got tunnel vision.  You're paying
16        attention to other things other than what your partner
17        to your right is doing.
18   Q.   You said "get ready" twice, right?
19   A.   It doesn't mean I had to see my partner.
20   Q.   Okay.  But you said "get ready" twice, right?
21   A.   I said "get ready" twice.
22   Q.   Get ready for what?
23   A.   Well, we were coming up on Gratiot Avenue.  I saw
24        fields off to our right.  I thought the person might
25        bail or something was about to happen.
```

```
 1   Q.   Was there -- prior to the Taser being deployed by your
 2        partner, was the ATV always in your field of vision?
 3   A.   Yes, besides when I had to turn around on him right at
 4        the beginning.
 5   Q.   Fair enough.  Let me rephrase.  Within the ten seconds
 6        before -- let me rephrase.
 7                 Within the ten seconds before the Taser
 8        being deployed, was the ATV with Mr. Grimes on it
 9        always in your field of vision?
10   A.   Yes.
11   Q.   Were you able to see the person on the ATV when you
12        heard the pop sound that you believed was the Taser
13        being deployed?
14   A.   Can you re-ask that question?
15   Q.   Sure.  Were you able to see the person on the ATV when
16        you heard the pop sound that you believed was the
17        Taser?
18   A.   Yeah, I don't recall if I was looking at the --
19        looking at Grimes or not when the pop went off.  I
20        don't recall.
21   Q.   So let me just even step back.  Why are you pursuing
22        this individual in the first place?
23   A.   He was driving in a reckless manner on Reno and also
24        you can't have ATVs on city streets.
25   Q.   But why initiate a pursuit?
```

BERGER, TROOPER ETHAN
12/07/2018                                                      Page 38

```
 1                    MR. FEDYNSKY:  Objection, asked and
 2         answered.
 3                    Go ahead.
 4    A.   Because he didn't stop.
 5    BY MR. HARRINGTON:
 6    Q.   Okay.  Did you activate -- did you continuously have
 7         your lights and sirens activated from when you made
 8         the decision to initiate the stop until after the
 9         Taser was deployed?
10    A.   My sirens, yes.  My lights, no.
11    Q.   Why?
12    A.   I don't know what happened with the lights.
13    Q.   You turned the lights on after the incident, correct?
14         You went over to your patrol vehicle and flipped them
15         on, right?
16    A.   Well, they were turned on at the start of the chase.
17    Q.   For a second, wasn't it?
18    A.   I don't recall the time, but the only way those
19         cameras come on is if the lights are turned on, not
20         the sirens.
21    Q.   You know that there's a metadata analysis of your
22         lights and sirens, correct?
23    A.   Yes.
24    Q.   Have you reviewed it?
25    A.   No.
```

BERGER, TROOPER ETHAN
12/07/2018                                                                    Page 39

```
 1   Q.   Do you dispute the findings -- let me rephrase.

 2             Has anybody told you the findings of the

 3        metadata analysis of the lights and sirens?

 4   A.   No, or not that I recall.

 5   Q.   After Mr. Grimes had been Tased, you heard that pop,

 6        right?

 7   A.   I heard the pop, yes.

 8   Q.   You realized he had been Tased, yes?

 9   A.   I didn't realize it until kind of after the fact when

10        he had crashed, there was Taser wiring on the ground.

11   Q.   Did you see the crash?

12   A.   No, I didn't see the crash.

13   Q.   Did you hear a crash?

14   A.   I did.

15   Q.   After you heard the crash, did you look in any

16        rearview or side view mirrors to see what happened?

17   A.   No.  I just -- no.

18   Q.   Did you ever -- did you ever say anything to Trooper

19        Bessner, why did you Tase him?

20             MR. FEDYNSKY:  Object to the form.

21             But go ahead.

22   BY MR. HARRINGTON:

23   Q.   Something similar to that.  Maybe not those exact

24        words, what were you thinking, what were you doing,

25        why did you do that?
```

BERGER, TROOPER ETHAN
12/07/2018                                                                    Page 40

```
 1   A.   Maybe not those exact words, but after the incident
 2        when we were going back over what had just happened,
 3        either I asked him or he had told me without even me
 4        asking him.
 5   Q.   And what did he say?
 6   A.   He was fearful that Grimes was armed and Trooper
 7        Bessner had told me that he saw Grimes reach for his
 8        waistband.
 9   Q.   Did you believe him?
10   A.   Yeah, I believed him.
11   Q.   Did he tell you where during this pursuit he saw him
12        reach for the waistband?
13   A.   No.
14   Q.   I think in some of the documents it indicated that
15        there were some violent individuals that would be in
16        this area that are armed or anything?
17   A.   Yes, sir.
18   Q.   And I think you wrote in the report that you believed
19        that he was one of these violent individuals?
20   A.   Yes, sir.
21   Q.   What was it about Mr. Grimes when you saw him that you
22        thought he was one of these violent individuals?
23   A.   Well, I know that ATVs are relatively easy to steal
24        and the information that we had gathered in that exact
25        area was young black males and ATVs are easy to steal.
```

BERGER, TROOPER ETHAN
12/07/2018                                                          Page 43

```
 1      guys wanted, yes?

 2  A.  No.

 3  Q.  What would have been the harm to allow him to continue

 4      riding if you just, say, backed off a little bit and

 5      kept some space between the patrol vehicle and the

 6      ATV?

 7  A.  During the pursuit?

 8  Q.  Yeah.

 9  A.  I guess there wouldn't have been any harm.

10  Q.  I mean, you had no information that this was a person

11      who had just robbed a bank or killed somebody or shot

12      up a store or anything like that, correct?

13  A.  Correct.

14  Q.  It was just somebody that you saw on routine patrol,

15      what, pop a wheelie?

16              MR. FEDYNSKY:  Object to foundation and

17      form.

18              Go ahead.

19  A.  He did pop a wheelie, yes.

20  BY MR. HARRINGTON:

21  Q.  Well, what was it that he did that you said to

22      yourself, you know what, I need to pursue this kid?

23              MR. FEDYNSKY:  Objection, asked and

24      answered.

25              Go ahead.
```

BERGER, TROOPER ETHAN
12/07/2018                                                                        Page 54

```
 1   Q.   And you've looked at both Photograph 18 and

 2        Photograph 19?

 3   A.   Yes.

 4   Q.   And do they accurately depict the demonstration that

 5        we did?

 6   A.   Yes.

 7             MR. FEDYNSKY:  And I'll just reiterate the

 8        objection for the demonstration at a deposition for

 9        oral questioning, but go ahead and proceed.

10             MR. HARRINGTON:  I'm sure I'm the first

11        lawyer that's ever done that in the history of

12        depositions.

13   BY MR. HARRINGTON:

14   Q.   You saw Mr. Grimes do a wheelie?

15   A.   Yes, sir.

16   Q.   And how long did he do the wheelie?

17   A.   Not long.  Two seconds.

18   Q.   Because some people, they can ride these four-wheelers

19        and just go for a really good distance on two wheels.

20        It was only a quick couple seconds?

21   A.   Yes, sir.

22   Q.   Is that illegal?

23   A.   I would consider that reckless driving, yes.

24   Q.   Do you know how fast the patrol vehicle, at its

25        fastest point during any point of the pursuit, how
```

1   Q.   Sure.  Is there anything that Trooper Bessner has told

2        you that makes you disbelieve his version of events?

3   A.   No.

4   Q.   Now, you wouldn't have done what he did?

5   A.   Well, I didn't see what Mark told me he saw.

6   Q.   But knowing what you know about this incident, you

7        wouldn't have done what he did?

8   A.   No.

9   Q.   So in your report, you wrote something about driving

10       directly towards me in a challenging manner.  Explain

11       what Mr. Grimes was doing that led you to believe that

12       he was driving directly towards you in a challenging

13       manner.

14  A.   As I was going northbound, he was coming southbound at

15       me at a high rate of speed and he continued.  He

16       continued to come right towards my vehicle, my patrol

17       vehicle, and almost like playing a game of chicken, if

18       you're familiar.  That, to me, is a challenging -- a

19       challenge.

20  Q.   And is that confirmed on video?

21  A.   That I'm going northbound and he's coming southbound

22       at me, yes.

23  Q.   Okay.  And what road was that on?

24  A.   That was on Reno Street.

25  Q.   You wrote in your report that you make a U-turn.  And

BERGER, TROOPER ETHAN
12/07/2018                                                      Page 107

```
 1   A.   Knowing what I know now, I wouldn't have followed him

 2        so closely, but that's a pretty standard operating

 3        practice when we're chasing someone.  I mean, I

 4        wouldn't have followed so closely so Mark wouldn't

 5        have been able to Tase him.  But knowing what I know

 6        now with 20/20 hindsight, I wouldn't have chased him.

 7        I think that's kind of a vague question.

 8   Q.   And so we're clear, it's your testimony that when you

 9        said "get ready, get ready", it had nothing to do with

10        Trooper Bessner Tasing Mr. Grimes?

11   A.   True.

12   Q.   Okay.  You understand how people looking at this could

13        draw a reasonable conclusion that that's what you were

14        really doing, was telling him to "get ready, get

15        ready" in connection with Tasing him, you understand

16        how people can draw that conclusion, right?

17             MR. FEDYNSKY:  Object to the form and the

18        foundation.

19             Go ahead.

20   A.   I understand how people could draw that conclusion.

21        Do I think it's reasonable, I don't know, because

22        they've never been in a patrol car chasing someone on

23        the east side of Detroit, so I think -- I mean,

24        obviously I've got a biased opinion whether

25        something's reasonable about my report.
```

BERGER, TROOPER ETHAN
12/07/2018                                                              Page 136

```
 1   Q.   Now, Mr. Harrington went over a few of the things that
 2        Mr. Grimes did on that ATV.  You observed Mr. Grimes
 3        doing a wheelie, is that correct?
 4   A.   Correct.
 5   Q.   Putting both of the front tires in the air for a short
 6        period of time?
 7   A.   Right.
 8   Q.   And I think you described it as almost a game of
 9        chicken in terms of Mr. Grimes approaching towards
10        your patrol car at a high rate of speed on his ATV.
11        Do you recall that testimony?
12   A.   Yes, sir.
13   Q.   And there's something in your report about how you
14        positioned your vehicle to catch the attention of the
15        rider and to show Mr. Grimes that he knew a patrol car
16        was nearing him.  What did you do with your patrol car
17        to do that?
18   A.   I turned the patrol car to the left, not perpendicular
19        to the roadway, but slightly to the left so Grimes
20        could see the door badge.
21   Q.   Okay.  Just to display that you're in a marked police
22        car, right?
23   A.   Yes, sir.
24   Q.   And what did Mr. Grimes do after you positioned your
25        car that way?
```

BERGER, TROOPER ETHAN
12/07/2018                                                                    Page 137

```
 1   A.   He continued at me southbound.

 2   Q.   Okay.  And was it at a high rate of speed?

 3   A.   The speed had not changed, so it was still the same

 4        rate of speed.

 5   Q.   And what did you mean in your report that he

 6        approached you in a challenging manner before sharply

 7        turning off at the last minute and narrowly avoiding a

 8        collision with the patrol car?

 9   A.   What I meant was that I just perceived him not slowing

10        down, not turning way out of the way for a much larger

11        vehicle than his.  That was a challenge.

12   Q.   Okay.  And what type of clearance was there between

13        his vehicle and the patrol car when he passed your

14        patrol car?

15   A.   It was not a lot of clearance, maybe a couple feet.

16   Q.   And approximately how tall did Mr. Grimes appear to

17        you?

18   A.   He was larger.  I would say 6'3", 6'2".

19   Q.   And in terms of his weight, how did he appear?

20   A.   About 250.

21   Q.   And in terms of his age, how did he appear to you

22        before you got to see his ID or anything that

23        indicated his age?

24   A.   About my age, middle/upper 20s.

25   Q.   Your report says early 20s.  Is that what he looked
```

BERGER, TROOPER ETHAN
12/07/2018                                                              Page 138

```
 1          like to you then?

 2   A.     I guess 20s.

 3   Q.     And then you made a U-turn and pursued, is that

 4          correct?

 5   A.     Yes.

 6   Q.     And that decision was based on what?

 7   A.     That decision was based on the facts that I described

 8          earlier about him challenging us, the rate of speed.

 9          You can't drive four-wheelers on, you know, city

10          streets, so there as an infraction right there and the

11          fact that he didn't stop for us.

12   Q.     As far as you know, the sirens at the very least were

13          on during the pursuit?

14   A.     Yes.

15   Q.     And did Mr. Grimes ever pull over and stop?

16   A.     No.

17   Q.     Did he ever demonstrate any kinds of compliance in

18          terms of the traffic stop you were trying to initiate?

19   A.     No.

20   Q.     Did you ever observe him run through a yield sign?

21   A.     He did.

22   Q.     And did you -- how many times, just once, the yield

23          sign?

24   A.     One yield sign.

25   Q.     Okay.  Did he ever disregard a stop sign too?
```

BERGER, TROOPER ETHAN
12/07/2018                                                            Page 139

```
 1   A.    Yes.

 2   Q.    And did you describe that in your report as reckless?

 3   A.    I believe I did.

 4   Q.    Okay.  And why would it be reckless to disregard a

 5         yield or a stop sign?

 6   A.    I mean, it's putting the public in danger.  I mean, if

 7         you look it from the law standpoint, reckless driving

 8         is two moving infractions going on simultaneously, so

 9         speeding, driving a four-wheeler on the street and

10         running a yield and stop sign.

11   Q.    So before there was ever any Taser deployment, was it

12         your opinion that Mr. Grimes was driving recklessly?

13   A.    Yes.

14   Q.    Now, your statement to Bessner about "get ready", did

15         that have anything to do with indicating to him that

16         you wanted him to -- to Bessner that you wanted him to

17         deploy a Taser?

18               MR. HARRINGTON:  Form, foundation.

19   A.    No.

20   BY MR. FEDYNSKY:

21   Q.    And what did you mean to him when you said, "get

22         ready"?

23   A.    I knew something had to happen with Grimes and where

24         he was going or how he was going to continue -- or how

25         we were going to continue this chase.  We were
```

1        approaching Gratiot Avenue, a heavily congested area,

2        and we were also approaching a field kind of near the

3        Rossini/Gratiot interaction.  And I was just telling

4        Mark to be aware, we're not going to keep going

5        straight forever.  Something's going to change up

6        here.

7    Q.   So it could have been get ready for a foot pursuit?

8    A.   Yep.

9    Q.   It could have meant get ready for a higher level of

10       threat?

11   A.   Higher level of threat, change of direction.

12   Q.   Sure.  And I think we've gone over it, but just to put

13       a fine point on it, you never witnessed Bessner

14       drawing his Taser, did you?

15   A.   I never witnessed Bessner drawing his Taser.

16   Q.   And he never indicated he was going to draw or aim or

17       deploy his Taser, did he?

18   A.   Never indicated.

19   Q.   Now, was his window open during the pursuit, do you

20       know?

21   A.   From the start, I don't recall.  I mean, just knowing

22       what I know now, it had to have been sometime.

23   Q.   Yeah.  Let me -- that's a good clarification.  At the

24       beginning of the pursuit, do you recall, was his

25       window open or closed?

BERGER, TROOPER ETHAN
12/07/2018                                                          Page 141

```
 1   A.   I don't recall.

 2   Q.   Okay.  And I think it's fair to say you never saw him

 3        draw the Taser.  Did you ever see him aim the Taser?

 4   A.   No.

 5   Q.   And did you have any advanced notice any time in which

 6        you knew he was about to deploy that Taser from a

 7        moving vehicle at a moving vehicle?

 8   A.   No.

 9   Q.   When you heard the pop of the Taser, did that come as

10        a complete surprise to you?

11   A.   Yes.

12   Q.   Okay.  Do you know the method of the crash, in terms

13        of was the Taser that caused the crash, was it Grimes

14        being distracted, if you know what caused the crash?

15   A.   I don't know specifically what caused the crash.

16   Q.   Okay.  But you heard the crash, right?

17   A.   Yes.

18   Q.   And the crash came very shortly after the sound of the

19        Taser, is that correct?

20   A.   Yes.

21   Q.   And then you brought your vehicle to a stop, right?

22   A.   Correct.

23   Q.   Out in the field, do troopers ever draw a weapon,

24        whether it's their gun or an immediate weapon, like a

25        Taser, do they ever draw a weapon and keep it at the
```

BERGER, TROOPER ETHAN
12/07/2018                                                          Page 142

```
 1        ready, so to speak?

 2   A.   Yes.

 3   Q.   What does it mean to keep a weapon at the ready?

 4   A.   Basically kind of out of the person's sight, not so

 5        obvious that your weapon is drawn, maybe behind your

 6        back or behind your leg.

 7   Q.   Right.  You're not pointing it at anyone, right?

 8   A.   Right.

 9   Q.   But you have it out perhaps to increase the reaction

10        time?

11   A.   Right.

12   Q.   Okay.  And if you're about to be in a foot pursuit,

13        could it happen out in the field that someone would

14        draw the Taser to have it ready for a foot pursuit?

15   A.   Yes.

16   Q.   Okay.  And then when you did get to attend to

17        Mr. Grimes, you had got asked some questions about

18        your EMT training.  Do you recall what the three

19        categories are for assessing someone under that Coma

20        scale?

21   A.   Yeah.  Eye, speech and response to stimulus.

22   Q.   That's the one you couldn't remember, response to

23        stimulus.  So Mr. Grimes that day, did you, after the

24        crash, hear him speak at all?

25   A.   No.
```

```
 1                      CERTIFICATE OF NOTARY

 2   STATE OF MICHIGAN        )

 3                            ) SS

 4   COUNTY OF OAKLAND        )

 5

 6                I, CORISSA BAKKO, certify that this

 7        deposition was taken before me on the date

 8        hereinbefore set forth; that the foregoing questions

 9        and answers were recorded by me stenographically and

10        reduced to computer transcription; that this is a

11        true, full and correct transcript of my stenographic

12        notes so taken; and that I am not related to, nor of

13        counsel to, either party nor interested in the event

14        of this cause.

15

16

17

18

19

20

21                        Corissa Bakko

22                        CORISSA BAKKO, CSR-8346

23                        Notary Public,

24                        Oakland County, Michigan.

25        My Commission expires:  October 4, 2022
```