UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONIQUE GRIMES, as Personal
Representative of the Estate of
Damon Grimes, deceased

    Plaintiff,

v

TROOPER MARK BESSNER,
TROOPER ETHAN BERGER, and
SGT. JACOB LISS,

    Defendants.

No. 2:17-cv-12860

*consolidated with*

Case No. 17-cv-13580

HON. GERSHWIN A. DRAIN

MAG. ELIZABETH A. STAFFORD

---

| | |
|---|---|
| Geoffrey N. Fieger (P30441) | John G. Fedynsky (P65232) |
| James J. Harrington IV (P65351) | Mark E. Donnelly (P39281) |
| Danielle L. Dezbor (P79488) | Joseph T. Froehlich (P71887) |
| Stephanie L. Arndt (P66870) | Assistant Attorneys General |
| Fieger, Fieger, Kenney & Harrington, P.C. | Attorneys for Defs. Berger and Liss |
| Attorneys for Plaintiff | Michigan Dep't of Attorney General |
| 19390 W. 10 Mile Road | State Operations Division |
| Southfield, MI 48075 | P.O. Box 30754 |
| (248) 355-5555 | Lansing, MI 48909 |
| g.fieger@fiegerlaw.com | (517) 335-7573 |
| j.harrington@fiegerlaw.com | fedynskyj@michigan.gov |
| d.dezbor@fiegerlaw.com | donnellym@michigan.gov |
| s.arndt@fiegerlaw.com | froehlichj1@michigan.gov |

---

## Exhibit 3

Excerpts of Jacob Liss's deposition transcript

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF MICHIGAN

 3                       SOUTHERN DIVISION

 4

 5   MONIQUE GRIMES, as Personal

 6   Representative of the Estate of

 7   DAMON GRIMES, Deceased,

 8              Plaintiff,

 9        vs.                          Case No. 17-cv-12860

10                                     Hon. Gershwin A. Drain

11   TROOPER MARK BESSNER,

12   TROOPER ETHAN BERGER, and

13   SGT JACOB LISS,

14              Defendants.

15   _____

16

17

18        The Deposition of TROOPER JACOB LISS,

19        Taken at 14350 Ten Mile Road,

20        Oak Park, Michigan,

21        Commencing at 2:22 p.m.,

22        Friday, December 7, 2018,

23        Before Corissa Bakko, CSR-8346.

24

25
```

```
 1   A.   I couldn't say either way, sir.
 2   Q.   Did somebody tell you to throw away the Taser wire?
 3   A.   Yes.
 4   Q.   Who?
 5   A.   Trooper Klenner.  He told me to -- he came to the
 6        detachment.  He had a rolled-up wad of Taser wire and
 7        a rubber glove that contained a bloody piece of paper,
 8        earbud and I think maybe a broken chain.  Came back to
 9        the post.  I walked over to his car -- or came back to
10        the detachment in Detroit.  I walked over to his car.
11        He says, here, and pulls it out of his door pocket.
12        He said, Sergeant Zarate told me to clean this stuff
13        up from the scene.  I said, okay.
14                 As I'm grabbing this stuff from him,
15        Trooper Kurish -- I wasn't at the scene when they
16        cleaned up the scene.  I was already -- had gone to
17        the hospital, collected property at the hospital and
18        made my way back to the attachment.  I grabbed the --
19        basically I put gloves on because there was biohazard
20        on the Taser wire and the bloody glove.  And at that
21        time, also Trooper Kurish showed up with a bag full of
22        bloody gauze and stuff that they had cleaned up from
23        the scene and police tape.  I was under the impression
24        that this was all trash that was cleaned up from the
25        scene.
```

```
 1        said she doesn't give a shit, she didn't know about
 2        it.
 3   Q.   Was she at the scene?
 4   A.   No, she was not.
 5   Q.   Did you ever talk to Trooper Klenner about finding the
 6        wire in the trash can?
 7   A.   No.
 8   Q.   You know that he found the wire in the trash can,
 9        right?
10   A.   Later I heard that he did, yes.  I also retrieved the
11        wire and the glove from the trash can the next day
12        when I was told that they wanted it.  I went right
13        back to where I put it and I removed it and provided
14        it to First Lieutenant Powell.
15   Q.   You're sure Trooper Klenner didn't do that?
16   A.   Absolutely not.
17   Q.   Have you heard anything about Trooper Klenner saying
18        that he was sick to his stomach about what he had
19        found?
20   A.   I've heard since the incident, yes.
21   Q.   What's your understanding of that?
22   A.   I couldn't say, other than maybe he thought he was
23        going to get in trouble and was trying to protect
24        himself.
25   Q.   Hypothetically if -- let's just say nobody found out
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

| | | |
|---|---|---|
| 1 | | scene of a crime in accordance with official orders. |
| 2 | | You omitted material facts from your police report. |
| 3 | Q. | What evidence is being referenced that you failed to |
| 4 | | secure? |
| 5 | A. | Apparently the Taser wire. |
| 6 | Q. | Because you threw it in the trash can? |
| 7 | A. | Correct. |
| 8 | Q. | But that's because somebody told you to throw it in |
| 9 | | the trash can? |
| 10 | A. | Because I was led to believe that it was trash, yes. |
| 11 | Q. | But nobody specifically told you to throw it away? |
| 12 | A. | Correct. |
| 13 | Q. | Did anybody tell you to preserve it? |
| 14 | A. | No. |
| 15 | Q. | But you knew it was from the Grimes incident when you |
| 16 | | received it? |
| 17 | A. | I knew it was from the crash scene, yes. |
| 18 | Q. | If it was trash, why wouldn't have Trooper Klenner |
| 19 | | just thrown it away? |
| 20 | A. | Because he was told by Sergeant Zarate to clean up the |
| 21 | | scene, meaning pick up the trash.  So when he came |
| 22 | | back, I happened to be standing outside.  He said, |
| 23 | | here, Sergeant Zarate told me to bring this stuff -- |
| 24 | | clean the stuff up from the scene. |
| 25 | Q. | Okay.  But he's a trooper and you're a sergeant? |

```
 1   Q.   Detective Sergeant Poppema wrote that?
 2   A.   Yes.
 3   Q.   And then you wrote, yes, I will take care of it?
 4   A.   Yes, downloading the Tasers.
 5   Q.   Okay.  How come you didn't write back, the Taser was
 6        used.  I heard it over the radio?
 7   A.   Because at that point, he had already been in contact
 8        with Lieutenant Smiley and I thought he knew that
 9        there was a Taser deployment.  I thought he was
10        referring to everybody else's Taser to show there was
11        only one Taser deployed during this incident.  I
12        already had downloaded Trooper Bessner's Taser that
13        night.
14   Q.   But this says, maybe have them downloaded to show no
15        use?
16   A.   Correct.
17   Q.   Family is claiming he was Tasered?
18   A.   Yes.
19   Q.   Doesn't this kind of say, no, he wasn't Tasered,
20        download it to show there was no use?
21   A.   Right.  And I thought he was referring to everybody
22        else that was at the scene.
23   Q.   But that's not what it says in this text?
24   A.   But I'm telling you what I believed at the time.
25   Q.   But you could have been clear and texted back saying,
```

```
 1        well, there was Taser use?
 2   A.   I wrote what I wrote.  I don't know what time it was.
 3        I don't know what was going on at that moment.
 4   Q.   What process did you follow to retrieve the dash cam
 5        video from the Berger/Bessner vehicle regarding the
 6        Grimes incident?
 7   A.   I removed the memory card and I uploaded it to the
 8        system that we use to keep track of, you know, videos
 9        that are used.  It's called View Vault.  I uploaded
10        the video to the View Vault system where you can make
11        copies and that.  It records metadata which would have
12        speed, lights, brakes, stuff like that attached to it.
13   Q.   You pulled up the dash cam video and you watched it
14        with several sergeants, correct?
15   A.   Detective Sergeant Poppema, Detective Sergeant Becky
16        MacArthur and Detective Trooper Fahad Qureshi.
17   Q.   Who said something like, okay, that looks good, looks
18        like he just ran off the road, and that basically this
19        is going to be a one-paragraph report?
20   A.   Detective Sergeant MacArthur.
21   Q.   How did that make you feel when you heard that?
22   A.   Well, at that point, Sergeant Zarate had been in
23        contact with command.  Right after that, I was on the
24        phone with the hospital staff.  There was a charge
25        nurse that was asking if somebody could come to the
```

```
 1   Q.   And did they work a normal workday?
 2   A.   No, sir.  It was a scheduled fugitive sweep that had
 3        been planned.
 4   Q.   What's that?
 5   A.   Where we pull warrants from the area and then go and
 6        look for these subjects and try to arrest them on
 7        their warrants and close out some cases.
 8   Q.   Is that with any type of multi-jurisdictional task
 9        force or --
10   A.   No, sir.
11   Q.   -- is that something that the MSP does?
12   A.   There are multi-jurisdictional task force, but that is
13        something that a lot of state police posts will do to
14        close some of their open cases.  They will put
15        together packets and go out and try to arrest people
16        and basically close the reports that are open pending
17        arrests.
18   Q.   Did you retrieve Bessner's Taser?
19   A.   I did.
20   Q.   It was retrieved the day after?
21   A.   The day of, sir.
22   Q.   Are you sure?
23   A.   Yes, sir. Let me clarify.  When I got back to the
24        detachment, I took -- per policy, I took the Taser.  I
25        connected it to the computer through the port.  I
```

```
 1      downloaded what's called a Taser use report which will
 2      show the time, the duration, the temperature, things
 3      that pertain to the Taser deployment.
 4              I downloaded that Taser report and I
 5      provided a copy to Trooper Bessner for his report and
 6      for -- which we're required to do is a Blue Team
 7      investigation, which is the use of force report, which
 8      I've done probably hundreds of times on cases where
 9      somebody used a Taser or was in a pursuit or something
10      of that nature where you would, you know, provide them
11      with information they need to attach to the report.
12  Q.  And were you able to confirm that Trooper Bessner's
13      Taser was in fact used on Mr. Grimes?
14  A.  I don't have that data.  It showed that there had been
15      a Taser deployment.  It doesn't say whether or not it
16      made contact or anything like that.  It just shows
17      that there was -- the Taser was turned on at this
18      point.  There was a pull of the trigger, the duration
19      and basically when it was shut off.
20  Q.  Was it a five-second burst?
21  A.  No.
22  Q.  How long of a burst?
23  A.  Two seconds.
24  Q.  And do you know why it was only two seconds?
25  A.  I don't.  I don't know if the Taser was faulty or a
```

```
 1        lot of times what will happen with troopers is they
 2        have to do -- they're supposed to do what's called a
 3        spark check.  So at the start of your shift, you
 4        remove the cartridge, you pull the trigger on the
 5        Taser to make sure it's functioning and check your
 6        battery.
 7                  But what a lot of troopers do is they pull
 8        the trigger and then as soon as it starts to click,
 9        they shut it off.  What tends to happen is they build
10        that muscle memory.  And when they go to use the
11        Taser, as soon as you pull that trigger, it's supposed
12        to go for five seconds automatically.
13   Q.   Is it possible that it only worked for two seconds
14        because the wire broke off as --
15   A.   No.  I'm sorry.
16   Q.   -- as the vehicle kept going forward and Mr. Grimes
17        veered off to the right while having the Taser probes
18        in his body and then hits the F-150?
19   A.   No.  That would have no effect on the duration of the
20        deployment.
21   Q.   No.  But as far as the period -- the time period that
22        there's being the electrical charge?
23   A.   Two seconds, yes.
24   Q.   Yeah.  I mean, if the wire breaks off, wouldn't that
25        affect how much time that the --
```

```
 1   A.   No.  It would keep running.
 2   Q.   Okay.  But it wouldn't be obviously energizing Mr.
 3        Grimes if the wire breaks off?
 4   A.   Right.  If the wire broke, there would have to be a
 5        connection, but it wouldn't automatically stop the
 6        cycle of electricity, do you know what I mean, if it
 7        breaks?  The only way to stop it is if it malfunctions
 8        or if you turn it off.
 9                 (Recess taken at 3:41 p.m.)
10                 (Back on the record at 3:47 p.m.)
11   BY MR. HARRINGTON:
12   Q.   Did you canvass the area at all?
13   A.   No.
14   Q.   Did you with any individuals who claim that they saw
15        some, part or all of this incident that were
16        civilians?
17   A.   No.
18   Q.   How long were you on scene with respect to the Grimes
19        incident?
20   A.   I was on scene -- I'm just rough guessing here.  I was
21        on scene for the first probably hour or so and then I
22        had Trooper Bessner, Trooper Berger clear the scene
23        and meet me at the 9th Precinct because I wanted to
24        speak with them.
25   Q.   About what?
```

```
 1   Q.   In terms of the Taser that Bessner used that day, my
 2        understanding is that that model Taser had two types
 3        of functionality, is that true?  It has a probe mode
 4        and a drive stun mode?
 5   A.   Correct.
 6   Q.   And can you just explain kind of in layman's term what
 7        is the probe mode on that Taser?
 8   A.   The probe mode is muscular distortion, if you will.
 9        It's not a pain compliance thing.  It's a muscle
10        control.  Basically it causes you to tighten up.
11   Q.   And what's the mechanism in terms of how the probe
12        mode is deployed?
13   A.   Once the trigger is depressed, there's a -- the
14        electricity that runs through the end of the Taser
15        will activate a small, I guess for a better term,
16        explosion within that cartridge which projects the
17        Taser probes towards the target.
18   Q.   And there's basically two prongs on the end of two
19        wires?
20   A.   Correct.
21   Q.   And, generally speaking, do you know what the range of
22        those wires is?
23   A.   The state police uses 25 feet of -- the cartridges are
24        rated for 25 feet.
25   Q.   Okay.  And then if you remove the cartridge, how does
```

```
 1          the drive stun method work?
 2   A.     That would be a direct contact and it would be pain
 3          compliance.
 4   Q.     And that's basically where you see the sparking at the
 5          end of the Taser?
 6   A.     Correct.
 7   Q.     And you need to physically apply it to a person?
 8   A.     Correct.
 9   Q.     And that's just localized pain control?
10   A.     Correct.
11   Q.     Okay.  Now, in terms of these Taser wires, once the
12          probe mode is deployed, are those wires like reusable
13          where you would collect them after they've been
14          deployed?
15   A.     No.  They're actually very brittle.
16   Q.     Are they deposable?
17   A.     Yes.
18   Q.     So in your experience in law enforcement, what is done
19          with Taser wires when they're deployed at an arrest?
20   A.     The wires are basically thrown away.
21   Q.     They're collected and thrown away?
22   A.     They're collected and thrown away.
23   Q.     In your experience, have Taser wires ever been marked
24          as evidence, bagged and used as evidence in a criminal
25          proceeding?
```

```
 1   A.   No.
 2   Q.   Okay.  And you mentioned that these wires are brittle.
 3        Does that mean that these 25-foot pieces of wire can
 4        break into multiple pieces sometimes?
 5   A.   Yes.
 6   Q.   And did you make any observations at that scene
 7        whether it was just two long strands or whether there
 8        were --
 9   A.   There appeared to be a couple long strands, but there
10        was also broken strands laying around the scene.
11   Q.   Okay.  Is there anything else that's ejected out of
12        the Taser when the cartridge mode is used?
13   A.   There's what are called AFIDS.  They're small little
14        pieces of paper.
15   Q.   And that's A-F-I-D-S?
16   A.   Yes, I believe so.
17   Q.   Okay.  I'm not sure what that stands for.  If you
18        know --
19   A.   I don't remember.
20   Q.   Okay.
21   A.   They have serial numbers on them, so it matches the
22        cartridge that you use.
23   Q.   Okay.  So it's little identifiers in terms of what
24        cartridge was deployed?
25   A.   Correct.
```

```
 1   Q.   Okay.  And that could be useful at a crime scene?
 2   A.   It could, or if you had multiple people deploy a Taser
 3        at a scene, you could determine who was in what area.
 4   Q.   Okay.  When it was deployed?
 5   A.   Correct.
 6   Q.   Okay.  And just to clarify, it sounds to me like, from
 7        your point of view, these Taser wires that were handed
 8        to you were what?
 9   A.   I believed them to be biohazard trash.
10   Q.   Along with whatever was in that glove?
11   A.   That rubber glove with some paper.
12   Q.   Sure.  And it's your understanding by a few hours
13        later the next day, those items were recovered from
14        the same trash can?
15   A.   Yes.
16   Q.   And they were in the same place?
17   A.   Exact same place.
18   Q.   As far as you know, is there any allegation that any
19        of that evidence was contaminated or degraded or
20        anything like that?
21   A.   No.
22   Q.   And there haven't been any charges from the Wayne
23        County prosecutor regarding mishandling of evidence,
24        have there --
25   A.   No.
```

```
 1                    CERTIFICATE OF NOTARY

 2     STATE OF MICHIGAN          )

 3                                ) SS

 4     COUNTY OF OAKLAND          )

 5

 6                I, CORISSA BAKKO, certify that this

 7     deposition was taken before me on the date

 8     hereinbefore set forth; that the foregoing questions

 9     and answers were recorded by me stenographically and

10     reduced to computer transcription; that this is a

11     true, full and correct transcript of my stenographic

12     notes so taken; and that I am not related to, nor of

13     counsel to, either party nor interested in the event

14     of this cause.

15

16

17

18

19

20
                          [signature: Corissa Bakko]
21

22                     CORISSA BAKKO, CSR-8346

23                     Notary Public,

24                     Oakland County, Michigan.

25     My Commission expires:  October 4, 2022
```