UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONIQUE GRIMES, as Personal Representative of the Estate of Damon Grimes, deceased

    Plaintiff,

v

TROOPER MARK BESSNER, TROOPER ETHAN BERGER, and SGT. JACOB LISS,

    Defendants.

No. 2:17-cv-12860

*consolidated with*

Case No. 17-cv-13580

HON. GERSHWIN A. DRAIN

MAG. ELIZABETH A. STAFFORD

| | |
|---|---|
| Geoffrey N. Fieger (P30441) | John G. Fedynsky (P65232) |
| James J. Harrington IV (P65351) | Mark E. Donnelly (P39281) |
| Danielle L. Dezbor (P79488) | Joseph T. Froehlich (P71887) |
| Stephanie L. Arndt (P66870) | Assistant Attorneys General |
| Fieger, Fieger, Kenney & Harrington, P.C. | Attorneys for Defs. Berger and Liss |
| Attorneys for Plaintiff | Michigan Dep't of Attorney General |
| 19390 W. 10 Mile Road | State Operations Division |
| Southfield, MI 48075 | P.O. Box 30754 |
| (248) 355-5555 | Lansing, MI 48909 |
| g.fieger@fiegerlaw.com | (517) 335-7573 |
| j.harrington@fiegerlaw.com | fedynskyj@michigan.gov |
| d.dezbor@fiegerlaw.com | donnellym@michigan.gov |
| s.arndt@fiegerlaw.com | froehlichj1@michigan.gov |

# Exhibit 4

Excerpts of Thomas DeClercq's deposition transcript

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4

 5   MONIQUE GRIMES, as Personal

 6   Representative of the Estate of

 7   DAMON GRIMES, Deceased,

 8             Plaintiff,

 9         vs.                         Case No. 17-cv-12860

10                                     Hon. Gershwin A. Drain

11   TROOPER MARK BESSNER,

12   TROOPER ETHAN BERGER, and

13   SGT JACOB LISS,

14             Defendants.
15   _____

16

17

18        The Deposition of

19        DETECTIVE FIRST LIEUTENANT THOMAS DECLERCQ,

20        Taken at 7150 Harris Drive,

21        Dimondale, Michigan,

22        Commencing at 12:10 p.m.,

23        Tuesday, January 8, 2019,

24        Before Corissa Bakko, CSR-8346.

25
```

```
 1   Q.   All right.  So as part -- just so I understand your
 2        role.  You're a detective, yes?
 3   A.   I'm the commander of the special investigation
 4        section.  I have 20-some detectives that work for me
 5        that I assign investigations.
 6   Q.   Did you have any, I guess, firsthand role in
 7        investigating this Grimes matter?
 8   A.   I was the officer in charge.  I also assigned a lead
 9        detective sergeant, but ultimately I was responsible
10        for this investigation.
11   Q.   So as part of the officer in charge and in the context
12        of subparagraph B14 and B15 of the deposition notice,
13        did you ever look into whether or not either Trooper
14        Bessner or Trooper Berger had ever received any type
15        of psychological treatment in their life?  Was that
16        part of the scope of your investigation?
17   A.   Not that I recall.
18   Q.   What about any type of psychological counseling for
19        anything that had happened while they were on duty for
20        any reason?
21   A.   Not that I recall.
22   Q.   Okay.  I'm sorry.  Please continue with the deposition
23        notice with the scope of, are there any other matters
24        that you feel that you're not the person most
25        knowledgeable on regarding the particular issues
```

```
 1    A.   Okay.  Looking at the totality of it, I do not believe
 2         he was attempting to be deceptive.  I believe he was
 3         being truthful.
 4    Q.   Do you believe anybody --
 5    A.   I don't believe he was doing good police work.  I
 6         don't believe that's the proper way for a sergeant to
 7         handle something, but I don't believe he was trying to
 8         be deceptive.
 9    Q.   Well, do you believe that anybody was being deceptive
10         to him in any way?
11    A.   I don't know.
12    Q.   Well, you know that somebody gave him the wire, right?
13    A.   Yeah.
14    Q.   And do you know what was said -- let me rephrase.
15              Do you have an understanding as to what was
16         said between the individual that provided the wire to
17         Sergeant Jacob Liss and what he may have said back?
18    A.   Not that I can recall.
19    Q.   Do you think a sergeant with the Michigan State Police
20         who is partially investigating a fatality where a
21         Taser was used should know better than to throw away
22         Taser wire that was used?
23    A.   I absolutely agree with you on that.
24    Q.   Do you think that there was an effort by certain
25         individuals within the Michigan State Police to try to
```

```
 1            cover some of this -- some of the facts up that in
 2            fact a Taser was used in this incident?
 3    A.      No.
 4    Q.      Okay.  And you say that with total confidence?
 5    A.      I say that looking at the totality of this
 6            investigation, I do not believe that there was a large
 7            cover-up.  I believe some people did horrible police
 8            work.  Certain procedures and policies were not
 9            followed.  But looking at the investigation as a
10            whole, from the original point of the dispatch to
11            putting out over the radio that the person was Tased,
12            to having a Detective Sergeant on scene handling the
13            Taser wire but not knowing what it was, there was no
14            effort to conceal Taser wire.  Everyone saw it.
15            Everyone saw them stepping on it.
16                    So looking at this in the totality, no, I
17            don't believe.  Now, if somebody would have scooped
18            that up and hidden it and it wasn't until the autopsy
19            that we saw the probe, then I would have been on point
20            that somebody was covering this up.  But the fact that
21            the radio transmission went out, there was no attempt
22            to clean up the Taser wire, to hide the Taser wire, it
23            was still out in the open, what I believe it was poor
24            quality of police work.
25    Q.      Would an attempt to clean up the Taser wire along the
```

```
 1          lines of a cover-up being removing the Taser probes
 2          from the individual's body, say, before emergency
 3          response gets there?
 4    A.    So you're asking me a hypothetical question?
 5    Q.    Hypothetically I want you to assume that prior to,
 6          say, investigative response from the MSP arriving at
 7          the scene, assume that somebody from the MSP was
 8          taking the probes out of the individual's body, would
 9          that be what you might classify as an attempt to cover
10          up?
11    A.    With the scenario you're bringing up, if somebody
12          removed Taser probes and did not present them as
13          evidence or to a supervisor, yes, but that's not the
14          incident that occurred.
15    Q.    Okay.  Are you aware of any civilians who saw any of
16          the MSP individuals trying to pull out what they
17          believed to be consistent with Taser probes?
18    A.    I am aware that statements were given, a statement by
19          civilians, by witnesses that they were trying to
20          pull -- or pull Taser probes out, but based on the
21          autopsy results and the investigation, that is not
22          accurate.
23    Q.    Do you know if those witnesses were children or
24          adults?
25    A.    I believe the -- from the top of my head, I believe
```

```
 1        sergeant failed to notify the next level, who failed
 2        to notify the next level.  I don't believe there was a
 3        cover-up.
 4                  If you think it was a cover-up, it was an
 5        absolutely lousy attempt to cover up based on the fact
 6        that Mark Bessner over the radio admitted to Tasering
 7        him.  Mark Bessner left Taser wire everywhere.  The
 8        report indicates that a Taser was utilized.  There
 9        was -- there was no attempt, in my opinion, at
10        cover-up.
11   Q.   You agree with me that when you're investigating a
12        fatality like this, having all of the information as
13        soon as possible is best practice?
14   A.   Absolutely I agree with you.
15   Q.   And having the information that a Taser was in fact
16        used would have changed at least some of the
17        investigation that was done on the date that this
18        actually happened?
19   A.   Absolutely I agree with you.
20   Q.   Which would have or could have resulted in different
21        types of evidence that would have been obtained, such
22        as how you ask questions of witnesses maybe?
23   A.   I agree with what you're saying.  I do not believe the
24        outcome would have been any different.
25   Q.   Okay.  But what I'm getting at is, there's -- when you
```

```
 1                    CERTIFICATE OF NOTARY

 2    STATE OF MICHIGAN        )

 3                             ) SS

 4    COUNTY OF OAKLAND        )

 5

 6              I, CORISSA BAKKO, certify that this

 7      deposition was taken before me on the date

 8      hereinbefore set forth; that the foregoing questions

 9      and answers were recorded by me stenographically and

10      reduced to computer transcription; that this is a

11      true, full and correct transcript of my stenographic

12      notes so taken; and that I am not related to, nor of

13      counsel to, either party nor interested in the event

14      of this cause.

15

16

17

18

19

20
                            [signature: Corissa Bakko]
21

22              CORISSA BAKKO, CSR-8346

23              Notary Public,

24              Oakland County, Michigan.

25      My Commission expires:  October 4, 2022
```